**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Grinnell Mutual Reinsurance Company,

Plaintiff,

v.

Heritage Insurance Agency,

Defendant.

Civil No. 00-1632 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Leatha G. Wolter, Esq., Meagher & Geer P.L.L.P., 4200 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota 55402, appeared on behalf of Plaintiff.

James O. Redman, Esq., Bassford, Lockhart, Truesdell & Briggs, P.A., 3550 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota 55402, appeared on behalf of Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned judge on July 6, 2001, pursuant to Defendant's Motion for Summary Judgment. This is an action alleging insurance agent malpractice. In the Complaint, Plaintiff Grinnell Mutual Reinsurance Company alleges professional negligence by Heritage Insurance Agency. Specifically, Grinnell contends that: (1) Heritage breached its duty to exercise reasonable care and skill in performing its responsibilities to Grinnell, and its breach increased Grinnell's risk of loss and resulted in Grinnell's liability; and (2) in the course of business and in a transaction in which it had a pecuniary interest, Heritage negligently misrepresented to Grinnell that only four employees were driving insured corporate vehicles. This Court denies Defendant's motion for summary judgment because there are genuine issues of material fact. In conjunction with its memorandum in opposition to Defendant's motion for summary judgment, Plaintiff filed a cross-motion for

FILED AUG 10 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

summary judgment. Because Plaintiff's motion was untimely, however, the motion is summarily denied.

**Background**

Plaintiff Grinnell Mutual Reinsurance Company ("Grinnell") is an Iowa insurance company. Defendant Heritage Insurance Agency ("Heritage") is a Minnesota corporation located in Willmar, Minnesota. Grinnell first began writing commercial motor vehicle insurance for West Central Roofing ("WCR") in 1985. Kevin Crowley, an agent for Heritage, procured the policy for WCR from the inception of its business operations.

WCR, owned by Gene Underland and Todd Asche, is a small commercial roofing contractor near Willmar and has been operational since 1983. WCR has approximately four or five employees. Originally, WCR's employees performed all of the labor on the company's roofing jobs. This need is now filled through a subcontractor relationship with Kal's Contracting ("Kal's"). Sometime in 1990, then WCR employee, Kevin Torkelson, started Kal's specifically in order to provide subcontracted labor for WCR. Since October 1990, Kal's has provided 90-100% of the manpower and labor to complete the WCR jobs.

When WCR began contracting with Kal's, the parties agreed that WCR would provide the vehicles. WCR buys, fuels, maintains, and insures approximately 15 trucks. Kal's does not own any vehicles nor has it obtained any commercial automobile insurance. WCR keeps no records regarding who is using the vehicles nor when they are being used. Torkelson admitted that when he hires employees, he does not check their driving records. It is undisputed that Grinnell had no knowledge of the relationship between WCR and Kal's.

Kevin Crowley is not only the insurance agent for WCR, but for Kal's as well. Crowley serviced both WCR's and Kal's workers' compensation accounts every two years. When

Crowley worked on Kal's workers' compensation accounts in 1990, he was told of Kal's intentions to use WCR's vehicles. It is undisputed that Crowley knew after 1990 that Kal's employees consistently used WCR trucks. Payroll records from Kal's in 1994 and 1995 list the names of 46 employees, however, they do not indicate at which time of year these employees worked or the duration of their employment.

On three occasions, in August, September, and October 1994, Grinnell asked Heritage to provide a complete list of all drivers using WCR trucks, including the full name, date of birth, and drivers' license number for each driver. The first two requests went unanswered; however, the third request elicited a response. Upon receiving the October 1994 correspondence, Crowley forwarded the request to WCR. Crowley received WCR's response and faxed it to Grinnell on January 11, 1995. The list of drivers included the names of Todd Asche, Gene Underland, Kal Torkelson, and Wes Gunderson as drivers. In his deposition, Crowley testified that he did not believe the list to be inaccurate because the request was made during the dead of winter and because Kal's is a seasonal employer that typically would lay off workers until the next construction season began. It is uncontradicted that Crowley made no attempts to verify the accuracy of the list. It is also undisputed that, in January 1995, Kal's employed at least 11 individuals. Neither the duration of employment has been determined for those employees nor has it been determined whether those employees used WCR trucks during this period.

On or about February 20, 1998, Kal's employee Kevin Rache was driving a WCR truck when he was involved in an automobile accident. Grinnell paid $225,000 in benefits under the terms of the insurance policy, plus additional costs and attorney's fees. Rache was a Kal's employee in January 1995, but was not included in the list given to Grinnell. However, no evidence has been presented on whether Rache was a driver at the time the list was compiled.

Although Crowley freely admits that he was aware of the arrangement between Kal's and WCR for the use of equipment and vehicles, he did not disclose that fact to Grinnell at any time. Heritage justifies this decision by arguing that Grinnell's sporadic requests for information did not require such a response. Crowley testified that while he was aware that WCR allowed Kal's employees to drive its vehicles, he never volunteered that information to Grinnell because neither the use of the vehicles nor the geographic region where they were operated had changed, and he did not believe there was any increase in exposure on the part of the insurer.

On January 1, 1994, Heritage signed Grinnell's General Agent Contract, whereby it agreed not to bind Grinnell on any prohibited risk. Grinnell maintains that it is against company policy to insure a company with an arrangement like that of WCR and Kal's. Grinnell claims that had they known that Kal's employees were the regular and primary drivers of the trucks, it would not have renewed WCR's insurance policy.

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. Claim of Professional Malpractice**

To make out a case of professional malpractice, Grinnell must demonstrate that Heritage: (1) owed a legal duty; (2) breached that duty; and (3) thereby proximately caused damages. *See Johnson v. Urie*, 405 N.W.2d 887, 891 (Minn. 1987).

**a. Duty**

The parties dispute the nature of Crowley's duty within the facts of this case. Heritage maintains that Grinnell is claiming that Heritage had an ongoing duty to monitor the insurance needs of WCR and report that information back to Grinnell. To the contrary, however, Grinnell argues that Crowley should have acted in good faith and disclosed material information of which he had actual knowledge. Both parties have presented expert testimony to explain the nature and scope of an agent's duties. The Court finds, however, that such evidence is unnecessary to guide its decision because the law is abundantly clear.

The Minnesota Supreme Court has held that in the absence of a specific request from the customer, an agent has neither a duty to monitor the insurance needs of the insured nor a duty to report that information back to the insurer. *Tollefson v. American Family Ins. Co.*, 226 N.W.2d 280, 283 (1974). The legal duty of an insurance agent is to exercise the skill and care which a

"reasonably prudent person engaged in the insurance business would use under similar circumstances." *Johnson v. Farmers & Merchants State Bank of Balaton*, 320 N.W.2d 892, 898 (Minn. 1982). Specifically, "an insurance agent's duty is ordinarily limited to the duty imposed in any relationship, to act in good faith and follow instructions." *Gabrielson v. Warnemunde*, 443 N.W.2d 540, 543 (Minn. 1989). This Court agrees that the duty to act in good faith and follow directions is the proper standard to apply in this case in evaluating the conduct of Heritage and its agent, Crowley.

**b. Breach**

Heritage asserts that it had no legal duty to disclose to Grinnell any information about its customer, WCR, other than what was specifically requested by Grinnell. This assertion is incorrect, as a matter of law, because although it may satisfy the narrow duty to follow directions, it does not necessarily account for the broader duty to act in good faith. Grinnell's claims clearly raise the question of whether Crowley acted in good faith in responding to Grinnell's requests for information. In October 1994, the parties agree that Grinnell specifically requested a complete list of all drivers, including full name, date of birth, and drivers' license number. It is also undisputed that Crowley knew of the relationship between WCR and Kal's, a relationship of which Grinnell had no knowledge. Whether Crowley's non-disclosure of the relationship constituted a breach of his good faith duty to Grinnell, however, remains a genuine issue of material fact.

To the extent that Grinnell argues that Crowley failed to report a "material" fact, the Court declines to find a separate and specific duty that requires as such. That is not to say, however, that a failure to report a "material" fact may not result in a breach of a duty to act in good faith. Heritage argues that requiring an agent to determine and report that which is

"material" raises significant public policy concerns and imposes a duty so broad as to be virtually impossible not to breach, implicitly creating a duty to investigate. Grinnell contends, however, that such concerns are not present here because Heritage was actually aware of the material fact that it argues should have been reported, the ongoing driver relationship between WCR and Kal's.

The General Agent's Contract, which was signed by Crowley on September 28, 1994, imposed upon Heritage a duty to not bind the company on any prohibited risk. The contract states in relevant part: "General Agent will use the utmost diligence and good faith in the solicitations and applications for the insurance on behalf of Company and will not bind the Company on any prohibited risk . . . ." Therefore, anything that could be construed as a prohibited risk could be considered "material" for purposes of the responsibilities set forth in the agreement. Heritage makes the misplaced argument that while agent Crowley knew of the relationship between WCR and Kal's, he did not believe there was any increase in exposure on the part of the insurer as a result of the relationship, and therefore did not need to disclose this information to Grinnell. By withholding this information, Heritage effectively acted in an underwriting capacity, something that the General Agent's contract did not contemplate. A jury could determine that this is precisely the type of information that Heritage had a good faith duty to disclose.

Heritage finally asserts that since it was the agent for WCR, it owed WCR a fiduciary duty of good faith and loyalty. Heritage argues that affirmatively reporting information to Grinnell that adversely affected the interests of its client would be a violation of its fiduciary duty owed to WCR. This assertion is correct in that Heritage does owe WCR a duty of good faith and loyalty. However, the existence of this relationship does not necessarily preclude the

simultaneous duty owed by Heritage to Grinnell. In light of the evidence before the Court, there are significant disputes of fact remaining as to whether Heritage failed to act in good faith with respect to Grinnell, thus precluding the issuance of summary judgment.

**3. Causation**

Grinnell maintains that had it known of the relationship between Kal's and WCR that it would not have renewed the policy. As the only support for this statement, Grinnell asserts that the relationship between Kal's and WCR constituted a leasing arrangement and one that is in direct opposition to company policy. It was not until the Court's request at hearing, however, that Grinnell offered to present a copy of the Grinnell-WCR insurance policy, a document likely to contain any relevant provisions on this issue. Until the policy was received, however, the Court was presented with no evidence to either establish or challenge Grinnell's assertion. Even if Grinnell is able to present evidence of a policy to not insure leasing arrangements, genuine issues of fact remain as to whether the WCR-Kal's arrangement would qualify as such.

Because genuine issues of fact remain with respect to the elements of breach and causation, the Court is necessarily precluded from issuing summary judgment. As the Court stated briefly in its introduction, it declines to even reach the merits of Plaintiff's cross-motion for summary judgment because it was filed in an untimely manner. Accordingly, both parties' motions for summary judgment are dismissed with prejudice.

**4. Expert Testimony**

Heritage argues that the opinions of Grinnell's expert, Al Heidorn, are without foundation and inadmissible under federal law. Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if, (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principals and methods; and (3) the witness has applied the principles and methods of reliably to the facts of the case.

Fed. R. Evid. 702 (2001). In pertinent part, Rule 703 reads as follows:

> The fact or facts in the particular case upon which an expert bases an opinion or inferences may be those perceived by or made known to the expert at or before the hearing if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Fed. R. Evid. 703 (2001).

Heritage argues that Grinnell's expert, Al Heidorn, offers opinions which are an example of factually unfounded extrapolations made exclusively from his subjective personal experience without reference to any reliable and tested industry standards, protocols, or guidelines. Moreover, Heritage asserts that his opinions are not supported by any authoritative industry organizations and notes that he is not even a currently licensed insurance agent in the State of Minnesota.

Before accepting the testimony of an expert witness, the trial court is charged with a 'gatekeeper' function of determining whether the opinion is based upon sound, reliable theory, or whether it constitutes rank speculation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589-90 (1993). In *Daubert*, the United States Supreme Court imposed an obligation upon trial court judges to ensure that scientific testimony is not only relevant, but also reliable under the Rules of Evidence. *Id.* at 579. In doing so, the Court can consider: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known rate of potential error; and (4) whether the theory has

been generally accepted. *Id.* at 593-594. The purpose of these requirements "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).

In *Kuhmo Tire*, the Supreme Court determined, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony. The objective of that requirement is to ensure the reliability and relevancy of expert testimony. *Id.* at 152.

Subject to proper foundation being laid, and also in light of Federal Rules of Evidence and *Daubert*, it is this Court's conclusion that Mr. Heidorn possesses the requisite level of intellectual rigor that characterizes an expert in the field. Heidorn is a 40-year veteran of the insurance industry. Insurance expert testimony has been properly admitted by other courts based on years of experience in the insurance industry. *See United States Fidelity & Guar. Co. v. Sulco, Inc.,* 171 F.R.D. 305, 306-07 (D. Kan. 1997). Heidorn started his career as an underwriter and then began working for a national chain of insurance brokers, selling and servicing all lines of insurance. Heidorn then formed his own small retail insurance agency which he ran for three years before working for a large global insurance broker. Following his retirement in 1995, Heidorn established Al Heidorn Consulting, Inc., providing consulting services to the legal community on issues of insurance coverage and insurance agents' errors and omissions. Since 1995, Heidorn has given depositions in over nine agent error-and-omission cases.[1]

---

[1] Interestingly, Heidorn has twice been retained on behalf of the insurance agency by the law firm that currently represents Heritage.

Heritage maintains that Heidorn has never reviewed any industry standards of any kind. Although Heidorn admitted that he did not review any agency standards for the purpose of the relevant deposition, he is thoroughly familiar with all insurance industry standards. This is evidenced by the fact that Heidorn recently taught such standards at an October 1999 MILE seminar on insurance agents' professional responsibility. Heritage also highlights the fact that Heidorn has no list of publications. Heidorn explains that his former employers adopted prohibitions against publication and therefore publication was impossible. Heritage claims that Heidorn's experience is suspect because he was not a member of any professional association. During his course of employment, all three of the national brokers that Heidorn worked for were all active members of the National Association of Insurance Brokers. Heidorn is no longer a current member of any professional associations nor is he a licensed agent in the State of Minnesota because he is retired. He was licensed in Minnesota from 1966 until October 2000.

The Federal Rules of Evidence do not bar the testimony of Al Heidorn. Based on his extensive insurance background, Heidorn's testimony could prove helpful to the jury in understanding the duties and responsibilities of an insurance agent. To the extent that expert testimony has been presented, by either party, for the purpose of defining the scope of an agent's duty to an insurance company, the Court finds such testimony to be superfluous to its statement of the law on this issue. However, the Court reserves judgment on the admissibility of expert testimony on more narrow issues with respect to an agent's duties, such as how a reasonable agent operating within the scope of the defined duty may balance his duties to the insurer and the insured and what may constitute good faith under the relevant or comparable circumstances.

For the reasons stated, **IT IS HEREBY ORDERED**:

1. The Defendant's Motion for Summary Judgment (Doc. No. 14) is **DENIED**; and

2. Plaintiff's Motion for Summary Judgment (Doc. No. 25) is **DENIED**.

Dated: August 10, 2001

DONOVAN W. FRANK
Judge of United States District Court

**Please forward this announcement to the recipient of this fax.**

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

**For additional information on either program please visit our website at www.mnd.uscourts.gov.**

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500